IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

HERSHALL CRAVEN, Beneficiary of Michael Craven;
SHANE CRAVEN, Beneficiary of Michael Craven;
BRIAN CRAVEN, Beneficiary of Michael Craven; and
ROXANNE CRAVEN, Beneficiary of Michael Craven                    PLAINTIFFS

V.                                          CIVIL ACTION NO.:  2:12-cv-99-KS-MTP

PERRY COUNTY, a political subdivision;
JEREMY MCSWAIN, Individually; and
JIMMY DALE SMITH, Individually and in his
official capacity as Sheriff of Perry County                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment [52] of the

Defendants Jeremy McSwain and Jimmy Dale Smith.  Having considered the parties'

submissions, the record and the applicable law, the Court finds that the motion should

be granted.

## I.  FACTUAL AND PROCEDURAL HISTORY

This is an action for wrongful death brought by the siblings of Michael Craven

against Jeremy McSwain (a deputy sheriff with the Perry County Sheriff's Department),

Jimmy Dale Smith (the Sheriff of Perry County), and Perry County, Mississippi.  At

approximately 7:00 p.m. on February 8, 2011, Michael Craven arrived at the Crossroad

Grocery Quick Shop (the "Crossroad") to purchase beer.  (*See* Compl. [1] at p. 4.)

Joanna Hamby, an acquaintance of Mr. Craven, was hanging out at the Crossroad at

that time.  (*See* Hamby Dep. [52-8] 12:7-13, 21:20-22:7.)  Ms. Hamby observed Mr.

Craven purchase two cases of beer.  (*See* Hamby Dep. [52-8] 27:13-16.)  She also

noticed that Mr. Craven walked "really slow" on the way back to his truck, that he "held

onto the truck when he got in" it, and that "he was leaned over" while backing up his truck.  (Hamby Dep. [52-8] 36:19-25.)   Before exiting the Crossroad parking lot, Mr. Craven's truck collided with another vehicle.  (*See* Hamby Dep. [52-8] 31:8-32:20.) This collision did not appear to result in any vehicular damage and neither Mr. Craven nor the other driver left their respective vehicles.  The other driver "stuck his head out and told him [Mr. Craven] it was okay."  (Hamby Dep. [52-8] 32:16-20.)

Ms. Hamby was in her car in the Crossroad parking lot when she saw Mr. Craven pull out and take a left onto Morriston Road.  She observed Mr. Craven's truck enter the correct lane of traffic, but pull so far to the right that "half of his truck was in the ditch on the right side."  (Hamby Dep. [52-8] 33:6-9.)  Ms. Hamby followed Mr. Craven in her car as he drove down Morriston Road with half of his truck in the ditch for approximately three miles.  (*See* Hamby Dep. [52-8] 34:10-35:16.)  Eventually, Mr. Craven's truck became inoperable due to front-end damage and at least one of its tires blowing out. Ms. Hamby had a cell phone, but did not call anyone for assistance while she followed Mr. Craven.  (*See* Hamby Dep. [52-8] 36:9-17.)

After Mr. Craven's truck came to a stop, Ms. Hamby parked her car in the next driveway and went back to check on him.  Ms. Hamby provided the following testimony at deposition regarding her subsequent interaction with Mr. Craven:

> Walking up to the window and asking him if he was okay.  And he told me that his truck wouldn't go.  And I told him because he blew out a tire, and we just talked for a few minutes.  And he told me that he had had a heart attack or stroke before.  And I basically just talked to him and asked him if I could call and get him a ride.  And I called some lady, called his sister or something.  And she never answered the phone.  So he asked me if I could give him a ride.  And I had kids in the back seat.  So I told him I couldn't.  And I tried his sister back, or daughter, a few times, but never got ahold of anybody.

(Hamby Dep. [52-8] 38:1-12.)  Ms. Hamby also testified that Mr. Craven kept telling her "that he had had a stroke or a heart attack, like, six or nine months before."  (Hamby Dep. [52-8] 46:19-47:1.)  Ms. Hamby did not think that Mr. Craven told her he was suffering from a heart attack or stroke at that time because she "would have called 911 if he had said that."  (Hamby Dep. [52-8] 46:19-47:6.)  Mr. Craven never asked Ms. Hamby to call an ambulance or the police.  (*See* Hamby Dep. [52-8] 39:3-6, 40:19-25, 54:9-16.)  Mr. Craven appeared "sick" in that he was "leaned over" and "real pale".  (Hamby Dep. [52-8] 42:17-43:2.)  Ms. Hamby did not observe any open container of beer in the front of Mr. Craven's truck or smell alcohol on him.  (*See* Hamby Dep. [52-8] 42:1-43:4.)  Approximately fifteen to twenty minutes after Ms. Hamby pulled over to check on Mr. Craven, Deputy McSwain arrived on the scene.  At no time prior to Deputy McSwain's arrival (or at any other time on February 8) did Ms. Hamby call 911, an ambulance or the Sheriff.  (Hamby Dep. [52-8] 40:13-14, 54:9-16, 74:4-9.)

The Perry County Emergency Dispatch received a call from an unidentified individual at approximately 7:34 p.m. on February 8, indicating that a man had just left the Crossroad, hit a car and was in a roadside ditch.  Deputy McSwain was dispatched "to a wreck, possible drunk driver".  (McSwain Dep. [52-1] 11:6-7.)  Upon his arrival at the accident scene, Deputy McSwain observed Mr. Craven's truck parked partially off the roadway.  Deputy McSwain then approached the truck and saw Mr. Craven sitting in the driver's seat and Ms. Hamby standing outside the vehicle.

Deputy McSwain testified at deposition to the following particulars regarding his subsequent interactions with Ms. Hamby and Mr. Craven.  Ms. Hamby told Deputy McSwain that Mr. Craven bought some beer at the Crossroad and bumped into a

vehicle while leaving the store.  Ms. Hamby also said that Mr. Craven had "a stroke in the past about a year ago."  (McSwain Dep. [52-1] 11:21-12:8.)  Deputy McSwain smelled alcohol on Mr. Craven's breath and observed one open container of beer in the cab of the truck.  (*See* McSwain Dep. [52-1] 12:9-15, 35:14-36:5.)  Deputy McSwain asked Mr. Craven if he had been drinking and Mr. Craven said, "Yeah, I've been drinking all day."  (McSwain Dep. [52-1] 12:10-15.)  Deputy McSwain also asked Mr. Craven if he was sick and if he needed medical attention.  Mr. Craven's response was, "No," he just wanted "to go home."  (McSwain Dep. [52-1] 13:9-23.)  Deputy McSwain requested that Mr. Craven exit the truck, helped Mr. Craven get to the back of the truck,[1] and asked Mr. Craven to blow on a portable intoxilyzer.  Mr. Craven "blew over the limit."  (McSwain Dep. [52-1] 12:16-21.)

The following portion of Ms. Hamby's deposition somewhat conflicts with the preceding testimony of Deputy McSwain:

> Q.  So it's your testimony that Mr. Craven told Deputy McSwain he had not been drinking alcohol?
>
> A.  I'm pretty sure that's what he said.  He asked him if he had been drinking, and I'm pretty sure he told him no.  And then he had – the cop talked to me, and I told him that he had had a heart attack or something before, and I told him how he was leaning over and I thought that's what was wrong, he was having a stroke or something. And I can't remember what all they talked about, but he talked to me and him.

(Hamby Dep. [52-8] 44:3-12.)  Ms. Hamby also stated that she told Deputy McSwain that Mr. Craven "had a stroke in the past, and . . . [she] believed he might be having

---

[1] Deputy McSwain assisted Mr. Craven at this point because he was "[k]ind of like slumped over" and had a "leaned walk."  (McSwain Dep. [52-1] 39:15-40:1.)  Deputy McSwain attributed Mr. Craven's difficulty walking to a prior stroke.

another one." (Hamby Dep. [52-8] 67:1-22; Hamby Aff. [55-7] at p. 2.) According to Ms. Hamby, Deputy McSwain's response was, "no, he's just drunk and we're going to arrest him for DUI." (Hamby Aff. [55-7] at p. 2.) Ms. Hamby did not remember if Mr. Craven "did a breathalyzer or not." (Hamby Dep. [52-8] 45:16-25.)

Deputy McSwain testified that he called Sheriff Smith for input after Mr. Craven blew over the limit on the portable intoxilyzer. (*See* McSwain Dep. [52-1] 13:9-23.) Sheriff Smith provided the following testimony at deposition regarding this telephone communication:

> Basically he [Deputy McSwain] related to me that the gentleman [Mr. Craven] had been drinking, and he had left the road and had blown out the right front tire, I believe it was, of the vehicle. He informed me that he had had a stroke a year earlier. I asked him did he need medical help now. He said, no, the man said he didn't need any medical help. I said, Well, if he's been drinking, carry him on down to the jail, run him on the Intoxilyzer, and then call me back and we'll – you know, if it goes DUI we'll do what we've got to do.

(Smith Dep. [52-10] 7:11-21.) Deputy McSwain complied with the Sheriff's directives and transported Mr. Craven to the Perry County Jail (the "Jail") in his patrol car.

On the way to the Jail, Deputy McSwain called another Perry County Deputy, Billy Anglin, to come in and run the Intoxilyzer 8000 machine. (*See* McSwain Dep. [52-1] 14:10-12.) Deputy McSwain was certified to operate the machine, but he had not yet received his operator's card. (*See* Anglin Dep. [52-11] 16:14-23.) Also during the ride to the Jail, Deputy McSwain asked Mr. Craven if he was okay and if he needed medical attention. Mr. Craven stated that he was okay and that he just wanted to go home. (*See* McSwain Dep. [52-1] 14:18-15:1.)

Mr. Craven was in the booking room when Deputy Anglin arrived at the Jail. While Deputy Anglin waited for the Intoxilyzer 8000 to start up, he asked Mr. Craven

whether he needed any medical attention.  Mr. Craven replied, "No.  I just had a little bit too much to drink."  (Anglin Dep. [52-11] 9:4-24.)  After Deputy Anglin advised Mr. Craven that his picture would be taken during booking, Mr. Craven said, "Well, you're going to have to help me up because I've had a stroke previous to – a year ago . . . ." (Anglin Dep. [52-11] 10:9-15.)  Deputy Anglin then asked Mr. Craven if he was taking any medication.  Mr. Craven said that he was and that the medication was at his home. Deputy Anglin asked Mr. Craven if there was anyone that could bring him the medication, and Mr. Craven replied, "No, there ain't nobody around to bring it to me." (Anglin Dep. [52-11] 10:16-23.)  Deputy Anglin subsequently told Deputy McSwain to call Sheriff Smith and see if Mr. Craven could be released on his own recognizance in the event he failed the Intoxilyzer 8000 test, so that he could have access to his medication.  (*See* Anglin Dep. [52-11] 10:24-11:3.)  Mr. Craven registered a .08% test result on the Intoxilyzer 8000, which is the minimum level of intoxication for DUI.  (*See* Anglin Dep. [52-11] 17:14-18.)  Deputy Anglin attributed Mr. Craven's "slurred speech" and "difficulty walking" to alcohol consumption, as opposed to any medical issue. (Anglin Dep. [52-11] 30:23-31:15, 41:11-42:11.)

Mr. Craven's photograph was taken for booking purposes by Jailer Kevin Ryan O'Neal.  (*See* O'Neal Dep. [52-14] 56:10-16.)  At certain times during the booking process, Mr. Craven needed assistance walking and standing.  (*See* O'Neal Dep. [52-14] 57:9-58:14.)  Mr. Craven "appear[ed] to be under the influence of alcohol", and not sick or in need of medical care.  (O'Neal Dep. [52-14] 77:18-79:7.)  Mr. Craven never asked for a medical provider while he was in Jailer O'Neal's presence.  Also, Mr. Craven "shook his head he was okay", when Jailer O'Neal asked him if he was ill or

sick.  (O'Neal Dep. [52-14] 79:8-12.)

Deputy McSwain had several telephone conversations with Sheriff Smith during the time that Mr. Craven was at the Jail.  Initially, Deputy McSwain advised Sheriff Smith that Mr. Craven was charged with DUI due to his Intoxilyzer 8000 test result. (*See* McSwain Dep. [52-1] 15:6-10.)  Deputy McSwain also informed Sheriff Smith that Mr. Craven had medication at home.  (*See* McSwain Dep. [52-1] 57:11-15; Smith Dep. [52-10] 8:9-10.)  Sheriff Smith told Deputy McSwain to see if Mr. Craven's relatives could bring him his medication.  (*See* Smith Dep. [52-10] 8:12-13.)  Over the course of one or more additional telephone communications, Deputy McSwain told Sheriff Smith that no one was available to bring Mr. Craven's medication to the Jail; that Mr. Craven did not have any money to post bond; and that Mr. Craven did not have anyone who could drive him home.  (*See* Smith Dep. [52-10] 8:16-10:6.)  Ultimately, Sheriff Smith authorized the release of Mr. Craven on his own recognizance and directed Deputy McSwain to take him home.  Deputy McSwain never informed Sheriff Smith that Mr. Craven needed medical attention.  (*See* Smith Dep. [52-10] 7:15-17, 8:4-6, 27:19-28:8.) Also, Sheriff Smith only spoke to Deputy McSwain, as opposed to any other deputies, about Mr. Craven on February 8.  (*See* Smith Dep. [52-10] 33:2-21.)

Mr. Craven was released from the Jail at approximately 9:57 p.m. on February 8. A medical questionnaire for Mr. Craven was not completed even though "[o]ne is to be filled out on every inmate that comes into the Perry County jail . . . ."  (Smith Dep. [52-10] 19:4-12.)  Jailer O'Neal would have been the individual to complete the questionnaire form.  At that time, Jailer O'Neal was under the impression that a medical questionnaire only had to be completed if an inmate was being kept overnight.  (*See*

O'Neal Dep. [52-14] 41:19-23.)  Sheriff Smith subsequently advised Jailer O'Neal that

he would need to complete the form "from now on to all inmates coming in."  (O'Neal

Dep. [52-14] 66:25-67:7.)

Deputy McSwain testified as follows regarding the transportation of Mr. Craven to

his home:

> I loaded him back in my car; took him home, you know.  And he was
> sitting in the back.  And I was just wanting to make sure he was okay.
> Steady having a conversation with him.  And I – I said, Mr. Craven, you going
> to be okay?  He said, Yes, sir.  He said, I sure appreciate what you're doing
> for me.  And I carried him on home.  Arrived at his house.  Walked him –
> walked him into his house and he went over and sit on the couch.  And I
> asked him again, I said, Now, are you okay, Mr. Craven?  He said, Yes, sir.
> He said, Mr. Officer, I appreciate you bringing me home.  And I said, You're
> welcome.  And I turned around and went to walk out.  And I asked him, I said,
> Do you want me to lock your door?  He said, No, just leave it unlocked.  He
> said, Just close it behind you.  And I went back out on patrol.

(McSwain Dep. [52-1] 16:1-17.)  Mr. Craven "was kind of leaning to one side" or

"slumped over" as he walked from the patrol car into his house.  (McSwain Dep. [52-1]

20:19-21:2.)  Deputy McSwain attributed this to Mr. Craven's prior stroke.  (*See*

McSwain Dep. [52-1] 21:3-5.)  At no time during Deputy McSwain's various interactions

with Mr. Craven did Mr. Craven request medical care or appear to be in need of medical

attention.  (*See* McSwain Dep. [52-1] 63:1-64:1.)

Mr. Craven's body was discovered by Charlene McMillen sometime between

2:00 p.m. and 3:00 p.m. on February 9, 2011, at his home.  (*See* McMillen Dep. [52-7]

66:17-18.)  Ms. McMillen "was a personal friend and relative" of Mr. Craven.  (McMillen

Dep. [52-7] 5:25.)[2]  Ms. McMillen testified at deposition that Mr. Craven had a stroke

---

[2] Ms. McMillen's sister is married to one of Mr. Craven's brothers, Shane Craven.
(*See* McMillen Dep. [52-7] 8:19-24.)

either one or two years prior to his death, and that she took care of him by cleaning his home and preparing his meals.  (*See* McMillen Dep. [52-7] 14:7-12, 16:23-17:9.)  Ms. McMillen also testified that Mr. Craven called her at approximately 10:30 p.m. on February 8 and told her, *inter alia*, that he totaled his truck; that he had been arrested and released from jail; and that he did not know if he was going to be okay.  (*See* McMillen Dep. [52-7] 52:11-58:12.)  According to Ms. McMillen, Mr. Craven was upset and did not sound like himself.  (*See* McMillen Dep. [52-7] 53:5-55:12.)  Also, Mr. Craven was generally unresponsive and, at times, gasped and breathed deeply.  (*See* McMillen Dep. [52-7] 56:17-57:5.)  Mr. Craven did not ask Ms. McMillen to call for any medical assistance.  (*See* McMillen Dep. [52-7] 56:17-20, 60:12-14.)  Ms. McMillen told Mr. Craven that "we'll take care of things in the morning" before hanging up.  (*See* McMillen Dep. [52-7] 57:12-15.)  Ms. McMillen did not call the Sheriff's Department, 911 or an ambulance after getting off the phone with Mr. Craven on February 8.  (*See* McMillen Dep. [52-7] 59:20-60:11.)[3]

Ms. McMillen arrived at Mr. Craven's residence at approximately 10:45 a.m. on February 9.  (*See* McMillen Dep. [52-7] 63:19-20.)  She looked for Mr. Craven in various rooms of the house, but was unsuccessful in finding him.  (*See* McMillen Dep. [52-7] 64:20-65:10.)  Ms. McMillen then laid down in Mr. Craven's bed and napped for approximately three hours.  (*See* McMillen Dep. [52-7] 66:1-16.)  Shortly after waking

---

[3] Ms. McMillen also provided testimony regarding a telephone conversation with Ms. Hamby and various telephone communications with a bail bondsman.  These telephone communications need not be detailed here because they constitute inadmissible hearsay and/or because they fail to shed light on the central issue of whether Deputy McSwain and Sheriff Smith were deliberately indifferent to Mr. Craven's serious medical needs.

from her nap, Ms. McMillen found Mr. Craven's body lying face down in the bathroom with his feet in the hall.  (*See* McMillen Dep. [52-7] 74:17-75:6.)  Ms. McMillen then called Mr. Craven's brother, Shane Craven, and 911.  (*See* McMillen Dep. [52-7] 75:14-77:7.)

Mr. Craven was pronounced dead at his residence by emergency medical personnel at 3:00 p.m. on February 9.  (*See* Death Cert. [52-17].)  The Death Certificate lists the hour of death as approximately 11:00 p.m. on February 8.  Probable myocardial infarction due to probable coronary artery disease is indicated as the cause of death.  High blood pressure and alcohol consumption are listed as other significant conditions contributing to Mr. Craven's death.  William Burl Hall, a deputy medical examiner for Jones County, placed the preceding information on the Death Certificate.  (*See* Hall Dep. [52-16] 7:14-16, 16:25-17:16.)  Mr. Hall is not a licensed physician.  (*See* Hall Dep. [52-16] 6:16-17.)  An autopsy was not performed on Mr. Craven's body.  (*See* Hall Dep. [52-16] 22:4-5.)  Mr. Hall primarily relied on oral statements from Mr. Craven's family members regarding his medical history in determining the cause of death.  (*See* Hall Dep. [52-16] 22:12-24:8.)

On June 7, 2012, Plaintiffs filed their Complaint [1] in this Court.  Subject matter jurisdiction is asserted under Title 28 U.S.C. §§ 1331 and 1367.  Plaintiffs allege that Defendants' failure to provide Mr. Craven with medical assistance violated his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution, entitling them to relief under 42 U.S.C. § 1983.  Damages are also sought under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).  Plaintiffs further seek relief under the Mississippi Tort

Claims Act ("MTCA"), Miss. Code Ann. §§ 11-46-1 to -23, and assert a general negligence claim against Deputy McSwain and Sheriff Smith.

On July 5, 2012, Deputy McSwain and Sheriff Smith moved for the dismissal of all state law claims asserted against them in their individual capacities.  (*See* Mot. to Dismiss [4].)  On August 14, 2012, the Court granted this request for dismissal.  (*See* Mem. Op. & Order [16].)  Currently pending is McSwain and Smith's request for summary judgment on the federal claims asserted against them in their individual capacities.  (*See* Mot. for SJ [52].)  This request for summary judgment has been fully briefed and the Court is ready to rule.

## II.  DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Initially, the movant has "the burden of demonstrating the absence of a genuine issue of material fact."  *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  If the movant meets this burden, the nonmovant must go beyond the pleadings and point out specific facts showing the existence of a genuine issue for trial.  *Id.*  "'An issue is material if its resolution could affect the outcome of the action.'"  *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)).  "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the

nonmoving party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation omitted).

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).  When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Sierra Club, Inc.*, 627 F.3d at 138.  However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."  *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).  Summary Judgment is mandatory "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 322), *cert. denied*, 132 S. Ct. 2103 (2012).

### B.  Analysis

#### 1.  Claims Under 42 U.S.C. § 1983

Deputy McSwain and Sheriff Smith assert the defense of qualified immunity in response to Plaintiffs' constitutional claims brought under 42 U.S.C. § 1983.  "Qualified immunity protects public officers from suit if their conduct does not violate any 'clearly established statutory or constitutional rights of which a reasonable person would have

known.'"  *Prison Legal News v. Livingston*, 683 F.3d 201, 224 (5th Cir. 2012) (quoting

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

"'Although nominally an affirmative defense, the plaintiff has the burden to negate the

defense once properly raised.'"  *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir.

2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)).  In order to

overcome the defense of qualified immunity, the plaintiff must show:  "(1) the official

violated a statutory or constitutional right; and (2) the right was clearly established at the

time of the challenged conduct."  *Khan v. Normand*, 683 F.3d 192, 194 (5th Cir. 2012)

(citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)), *cert.*

*denied*, 133 S. Ct. 840 (2013).  A constitutional right is clearly established when it is

"sufficiently clear that a reasonable official would understand that what he is doing

violates that right."  *Id.*  Courts have discretion to address the objective reasonableness

inquiry first.  *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d

565 (2009).

     The defense of qualified immunity, "even on summary judgment, gives ample

room for mistaken judgments by protecting all but the plainly incompetent or those who

knowingly violate the law."  *Poole*, 691 F.3d at 627.  In addition, the defense alters the

summary judgment burden of proof by requiring the plaintiff to evidence a genuine issue

of material fact.  *See Tolan v. Cotton*, 713 F.3d 299, 304 (5th Cir. 2013) (citing *Michalik*

*v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)).

     The Court first addresses whether the Plaintiffs have adduced sufficient evidence

for a reasonable jury to conclude that Deputy McSwain and Sheriff Smith violated Mr.

Craven's constitutional rights.  Plaintiffs allege that Sheriff Smith and Deputy McSwain

-13-

"denied appropriate medical treatment to Michael Craven in deprivation of his Eighth and Fourteenth Amendment constitutional rights."  (Compl. [1] at ¶ 30.)  A pretrial detainee's right to medical care arises from the Fourteenth Amendment's guarantee of due process.  *See Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (citation omitted).  The Eighth Amendment's prohibition of cruel and unusual punishment affords convicted inmates constitutional rights in connection with their medical care and safety.  *See Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The Fifth Circuit "has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care."  *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996)).  "When the alleged unconstitutional conduct involves an episodic act or omission,[4] the question is whether the state official acted with *deliberate indifference* to the inmate's constitutional rights, regardless of whether the individual is a pretrial detainee or state inmate."  *Gibbs*, 254 F.3d at 548 (emphasis added).

---

[4] In an "episodic act or omission" claim, an official is usually interposed between the prisoner and the governmental entity, such that the prisoner first complains of a particular act or omission of the official and secondarily to a policy, custom, or procedure that caused or allowed the act or omission.  *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).  Conversely, a "conditions of confinement" action focuses upon allegedly unconstitutional "conditions, practices, rules, or restrictions of . . . confinement."  *Hare*, 74 F.3d at 644.  Plaintiffs' deprivation of medical care allegations in this case fall into the former category since they center upon the purported acts or omissions of individuals, Sheriff Smith and Deputy McSwain.  *Cf. Tamez v. Manthey*, 589 F.3d 764, 769-70 (5th Cir. 2009) (finding the complaint that police detectives and jailers failed to provide a detainee with immediate medical care to qualify "as an 'episodic act or omission'").

"Deliberate indifference is an extremely high standard to meet."  *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  Neither negligence nor gross negligence will suffice.  *See Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)); *see also Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference"; a prisoner must show that officers "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.") (citations omitted).  The deliberate indifference inquiry focuses on the defendant's subjective state of mind:  "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer v. Brennan*, 511 U.S. 825, 838, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

A prison official cannot be found liable for failure to provide access to medical care "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  *Id.* at 837.  In "exceptional circumstances", the official's knowledge of a substantial risk of harm to an inmate may be inferred from the obviousness of the risk.  *Brewster v. Dretke*, 587 F.3d 764, 770 n.4 (5th Cir. 2009) (citing *Reeves v. Collins*, 27 F.3d 174,

176 (5th Cir. 1994)).[5]

The Court presumes, solely for purposes of this motion, that Michael Craven suffered from serious medical needs during the course of his interactions with members of the Perry County Sheriff's Department on February 8, 2011.  However, Plaintiffs have failed to evidence any genuine issue of material fact showing that Sheriff Smith and Deputy McSwain were subjectively aware of those needs and intentionally disregarded them.

### a.  Sheriff Smith

The summary judgment record shows that Sheriff Smith neither communicated with, nor personally observed Mr. Craven on February 8.  (*See* Smith Aff. [52-19] at ¶ 4.)  All of the information Sheriff Smith had about Mr. Craven came from Deputy McSwain.  (See Smith Dep. [52-10] 32:21-33:21.)  Deputy McSwain advised Sheriff Smith of the following pertinent matters regarding Mr. Craven during the evening and night of February 8:  that Mr. Craven had been drinking; that he registered a .08% test result on the Intoxilyzer 8000 and was charged with DUI; that he suffered a stroke a year ago; that he had medication at home; that no one was available to bring Mr. Craven's medication to the Jail; that Mr. Craven denied needing medical attention; and that Mr. Craven was fine.  (*See* Smith Dep. [52-10] at pp. 6-10, 27-28; McSwain Dep. [52-1] at pp. 13, 15, 26, 57-60.)  After being advised of the preceding information,

---

[5] For example, the Eighth Amendment is obviously violated when a prisoner is tied to a hitching post in the sun for approximately seven hours, during which time he is taunted by a prison guard, provided water only once or twice, and not given access to a bathroom.  *See Hope v. Pelzer*, 536 U.S. 730, 738, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

Sheriff Smith decided to release Mr. Craven on his own recognizance and directed Deputy McSwain to drive Mr. Craven home.  (*See* Smith Dep. [52-10] at pp. 9-10.) These circumstances, viewed in the Plaintiffs' favor and as a whole, fall well short of evincing: (1) that Sheriff Smith was aware "of facts from which an inference of substantial risk of serious harm could be drawn, (2) that . . . [Sheriff Smith] actually drew that inference; and (3) that . . . [Sheriff Smith's] response to the risk indicates that . . . [he] subjectively intended that harm occur."  *Tamez*, 589 F.3d at 770.

Plaintiffs' arguments in support of Sheriff Smith's culpability are not convincing. Plaintiffs contend that Sheriff Smith's knowledge "that something was medically wrong with Michael" can be inferred from the violation of the following Jail policies:  (1) an intake medical sheet is to be filled out for each inmate; and (2) individuals charged with DUI are to be held six to eight hours.  (Pls.' Mem. Brief in Supp. of Resp. to Mot. for SJ [56] at p. 17.)  As to the first policy, there is no indication that Sheriff Smith was aware prior to Mr. Craven's release that Jailer O'Neal failed to complete a medical questionnaire for him.  In fact, Jailer O'Neal testified that he discussed Mr. Craven's medical form with Sheriff Smith approximately one week after Mr. Craven was released from the Jail.  (*See* O'Neal Dep. [52-14] 66:5-67:7.)  The absence of any evidence showing that Sheriff Smith knew prior to Mr. Craven's release that a medical questionnaire had not been completed hardly leads to the conclusion that the Sheriff was aware that something was seriously wrong with Mr. Craven at any time relevant to the Complaint.

As to the second Jail policy, the summary judgment evidence supports the inference that Mr. Craven was released early so that he could have access to his

regular medication,[6] while only "speculation and conjecture" support the theory that

Sheriff Smith's wanton disregard of Mr. Craven's medical needs led to him not being

kept in the Jail overnight.  *Armour v. Knowles*, 512 F.3d 147, 155-56 (5th Cir. 2007)

(rejecting plaintiff's theory that required "too much 'speculation and conjecture'" in

affirming summary judgment).  In any event, a law enforcement officer's violation of

department policy "is constitutionally irrelevant" for purposes of a claim brought under §

1983.  *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009) ("Violations of non-federal

laws cannot form a basis for liability under § 1983, and qualified immunity is not lost

because an officer violates department protocol.") (citations omitted).

Plaintiffs also offer the following theory based on Sheriff Smith's deposition

testimony that County funds are used to pay for medical services provided to individuals

booked into the Jail:[7]

> If a reasonable jury were to determine that Deputy McSwain was aware of a
> medical issue with Michael, that determination would expand to concluding
> that Deputy McSwain relayed that information to Sheriff Smith who then
> decided to send Michael home so the sheriff's department would not have to
> pay for Michael's medical expenses.

(Pls.' Mem. Brief in Supp. of Resp. to Mot. for SJ [56] at pp. 17-18.)  Not surprisingly,

Sheriff Smith has executed an affidavit in response to this argument, stating that he

never considers the cost to the County in deciding whether an individual should be

released or whether an individual should receive medical care.  (Smith Suppl. Aff. [59-2]

at ¶ 4.)  Even overlooking Sheriff Smith's affidavit, Plaintiffs' unfounded hypothesis

---

[6] (*See* McSwain Dep. [52-1] 57:3-15; Smith Dep. [52-10] 27:5-28:8; Smith Aff. [52-19] at ¶¶ 6-7.)

[7] (*See* Smith Dep. [52-10] 44:8-45:10.)

(requiring multiple levels of speculation) is precisely the type of assertion that is "insufficient to avoid summary judgment."  *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (citation omitted); *see also Gobert*, 463 F.3d at 346-47 (agreeing with the defendant's contention that the claimant "impermissibly relies on conclusory statements and speculation, while unsuccessfully meeting the stringent deliberate indifference standard").

### b.  Deputy McSwain

Deputy McSwain's alleged violation of Mr. Craven's constitutional right to medical care is a closer call.  At various times on February 8, Deputy McSwain noticed that Mr. Craven was "slumped over" and "leaned" as he walked.  (McSwain Dep. [52-1] 20:19-21:2, 39:15-40:1.)  Also, accepting Plaintiffs' version of the facts, Ms. Hamby told Deputy McSwain that Mr. Craven "had a heart attack or something before"; that "he was leaning over and . . . that's what was wrong, he was having a stroke or something"; and/or that Mr. Craven "had a stroke in the past, and . . . [she] believed he might be having another one."  (Hamby Dep. [52-8] 44:3-12, 67:1-22; Hamby Aff. [55-7] at p. 2.)

The Supreme Court has provided that officers may avoid a finding of deliberate indifference by showing "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, *or* that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  *Farmer*, 511 U.S. at 844 (emphasis added).  Deputy McSwain's observations of Mr. Craven's difficulty walking, coupled with Ms. Hamby's statements to the effect that Mr. Craven might be having a stroke, preclude the Court from holding as a matter of law that Deputy McSwain did not know of

any underlying facts indicating a substantial risk of serious harm.  Yet, the following circumstances dictate a summary judgment ruling in accordance with the latter situation described in *Farmer*.

After Ms. Hamby told Deputy McSwain that Mr. Craven had a stroke in the past and that he might be having another one, Deputy McSwain stated, "no, he's just drunk and we're going to arrest him for DUI."  (Hamby Aff. [55-7] at p. 2; Hamby Dep. [52-8] 68:7-12.)  Mr. Craven "blew over the limit" on a portable intoxilyzer and was charged with DUI due to his .08% test result on the Intoxilyzer 8000.  (McSwain Dep. [52-1] 12:16-21, 23:1-16.)[8]  The law enforcement officers observing Mr. Craven on February 8, other than Deputy McSwain, testified that Mr. Craven appeared to be under the influence of alcohol, rather than sick or otherwise requiring medical care.  (Anglin Dep. [52-11] 30:23-31:15, 41:11-42:11; O'Neal Dep. [52-14] 77:18-79:7.)[9]  Mr. Craven denied needing medical attention in response to Deputy McSwain's numerous inquiries regarding his condition.  (*See* McSwain Dep. [52-1] 13:9-23, 14:18-15:1, 16:1-17, 63:4-

---

[8] The Court again accepts Plaintiffs' version of the facts by crediting Ms. Hamby's testimony that there was no open container of beer in Mr. Craven's truck and that Mr. Craven did not smell of alcohol, (*see* Hamby Dep. [52-8] 42:1-43:4), over Deputy McSwain's conflicting testimony.  (*See* McSwain Dep. [52-1] 12:9-15, 35:14-36:5.) Nonetheless, Ms. Hamby neither recalled whether Deputy McSwain administered a portable intoxilyzer, nor was present at the Jail where Mr. Craven was charged with DUI.  (*See* Hamby Dep. [52-8] 45:24-46:9.)  The Court is unaware of any rule of law requiring it to resolve unsupported inferences in the Plaintiffs' favor.

[9] Ms. Hamby, who has no medical or law enforcement training, testified that Mr. Craven "appeared to be very sick and hurting" after his truck came to a stop near Morriston Road.  (Hamby Dep. [52-8] 10:1-4, 64:13-22.)  However, this observation did not lead Ms. Hamby to call an ambulance, 911 or the Sheriff during the approximate fifteen to twenty minutes she stood by Mr. Craven before Deputy McSwain arrived on the scene.  (*See* Hamby Dep. [52-8] 43:5-11, 73:25-74:9.)  The Court finds the maxim that "actions speak louder than words" instructive here.

8.)[10]  Deputy McSwain "found Mr. Craven's behavior to be consistent with someone who had, had too much to drink, not someone incurring a medical emergency."  (McSwain Aff. [52-18] at ¶ 6.)

Based on this record, the Court finds that Deputy McSwain, perhaps "unsoundly", attributed Mr. Craven's impaired physical condition to alcohol consumption (or a past stroke),[11] as opposed to a serious medical issue requiring immediate care and attention. *Farmer*, 511 U.S. at 844.  Deputy McSwain's "failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."  *Id.* at 838.

Stated differently, the existence of fact issues as to whether Deputy McSwain negligently failed to recognize that Mr. Craven was suffering from a serious medical issue is not probative of any constitutional violation.  It is well established in the Fifth Circuit that an officer's negligence, or failure to use due care, and actionable deliberate

---

[10] Similarly, Deputy Anglin, Jailer O'Neal, Joanna Hamby and Charlene McMillen each testified that Mr. Craven never requested medical assistance during their respective interactions with him on February 8.  (*See* Anglin Dep. [52-11] 9:17-24, 21:3-9, 41:25-42:2; O'Neal Dep. [52-14] 77:24-78:1; Hamby Dep. [52-8] 39:3-4, 40:19-25; McMillen Dep. [52-7] 56:17-20, 60:12-14.)  Had Mr. Craven requested medical attention and Deputy McSwain ignored that request, the outcome on summary judgment would almost certainly be different.  *Cf. Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (finding that a nurse was deliberately indifferent to a prisoner's medical needs when she ignored his complaints of severe chest pain); *Caston v. Harris*, No. 4:12cv32, 2013 WL 2404013, at *4 (N.D. Miss. May 31, 2013) (denying summary judgment where the plaintiff alleged that correctional officers ignored his oral and written requests for medical care).

[11] (*See* McSwain Dep. [52-1] 21:3-10, 40:2-6.)

indifference are separate concerns.[12]  Accordingly, no issue for trial exists as to Deputy McSwain's alleged violation of Mr. Craven's constitutional right to medical care.

### c. Summation

Plaintiffs have failed to establish that Deputy McSwain or Sheriff Smith violated any constitutional right of Michael Craven.  Therefore, the Court need not consider the objective reasonableness of Deputy McSwain and Sheriff Smith's conduct (the second prong of the qualified immunity analysis), and summary judgment will be granted in favor of these Defendants, in their individual capacities,[13] on Plaintiffs' § 1983 claims.

### 2. Claims Under the ADA and the Rehabilitation Act of 1973

---

[12] *See, e.g., Tamez*, 589 F.3d at 766-67, 770-71 (finding no deliberate indifference in a suit brought by the family members of a pretrial detainee who died as a result of swallowing a bag of cocaine, despite a nurse advising the defendant detectives that the detainee needed a medical clearance before he could be received by the county jail since his pupils were maximally dilated, and suggesting that the detectives take the detainee to a nearby hospital with an emergency room and physician on-call); *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 883 (5th Cir. 2004) ("[A]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity."); *Domino*, 239 F.3d at 756 (finding that a prison psychiatrist's incorrect determination that an inmate was not a suicide risk failed to amount to deliberate indifference); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 524, 527-28 (5th Cir. 1999) (affirming the trial court's grant of summary judgment in favor of a jail medical assistant due to an absence of subjective deliberate indifference even though the assistant exhibited "unmistakably dangerous" behavior by leaving an asthmatic detainee unattended); *McClyde v. Jackson*, No. H-07-4244, 2010 WL 519763, at *9 (S.D. Tex. Feb. 9, 2010) (granting summary judgment where an officer "was aware of plaintiff's nosebleed, but was of the impression that it did not warrant immediate medical attention"), *aff'd*, 405 Fed. Appx. 891 (5th Cir. 2010).

[13] The defense of qualified immunity is inapplicable to official capacity claims. *See Hunter v. Town of Edwards*, 871 F. Supp. 2d 558, 562 (S.D. Miss. 2012) (citing *Keim v. City of El Paso*, 1998 WL 792699, at *3 (5th Cir. Nov. 2, 1998)).

Plaintiffs allege that Deputy McSwain and Sheriff Smith disregarded Mr. Craven's disabilities and discriminated against him in violation of the Rehabilitation Act of 1973 ("RA") and Title II of the ADA.  (*See* Compl. [1] at ¶ 35.)  Sheriff Smith and Deputy McSwain seek dismissal of these claims on the basis that neither statute provides for individual liability.  The Court finds this request for dismissal well taken.

The Fifth Circuit has held that the text of the RA does not provide for suit against a defendant in his or her individual capacity, and that § 1983 cannot be used as an alternative method for vindicating rights granted by the RA.  *See Lollar v. Baker*, 196 F.3d 603, 608-10 (5th Cir. 1999).  The Court has been unable to identify any published Fifth Circuit opinion addressing individual liability under the ADA.  However, in a fairly recent unpublished opinion, the Fifth Circuit noted that "the rights and remedies under the ADA and the RA are the same," and found that defendants could not be sued for ADA violations in their individual capacities.  *Nottingham v. Richardson*, 499 Fed. Appx. 368, 376 n.6 (5th Cir. 2012).  Moreover, numerous district courts within the Fifth Circuit have dismissed ADA claims asserted against defendants in their individual capacities given the similarities between the ADA and RA.  *See, e.g.*, *Pena v. Bexar County, Tex.*, 726 F. Supp. 2d 675, 689-90 (W.D. Tex. 2010); *Decker v. Dunbar*, 633 F. Supp. 2d 317, 357 (E.D. Tex. 2008), *aff'd*, 358 Fed. Appx. 509 (5th Cir. 2009).  Plaintiffs' ADA and RA claims against Sheriff Smith and Deputy McSwain, in their individual capacities, will be dismissed under the weight of the preceding authorities.

## III.  CONCLUSION

Sheriff Smith and Deputy McSwain are entitled to summary judgment on Plaintiffs' federal claims asserted against them in their individual capacities.  Also,

-23-

Deputy McSwain will be dismissed from this lawsuit since he has been sued only in his individual capacity and the Court previously dismissed Plaintiffs' state law claims against him.  (*See* Mem. Op. & Order [16].)

IT IS THEREFORE ORDERED AND ADJUDGED that Jeremy McSwain and Jimmy Dale Smith's Motion for Summary Judgment [52] is granted.  All individual capacity claims against Jimmy Dale Smith and Jeremy McSwain under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act of 1973 are dismissed from this cause with prejudice.  In addition, Jeremy McSwain is dismissed from this cause with prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that counsel for the parties are to contact the chambers of the United States Magistrate Judge Michael T. Parker within seven (7) days of the entry of this Order to schedule a case management conference.

SO ORDERED AND ADJUDGED this the 16th day of August, 2013.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE